UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X 11 Civ. 622 (ERK)(MDG)
DOUGLAS ALFORD,

                    Plaintiff,

      v.

                                             DECLARATION OF
                                           WALE MOSAKU

THE CITY OF NEW YORK, POLICE
OFFICER DANIEL GONG (Shield # 3785),
POLICE OFFICER CALEEF MCLEAN
(Tax Registration # 942157), and POLICE
OFFICERS JOHN DOE 1-8,

                        Defendants.
--------------------------------------------------------------------X

I, WALE MOSAKU, declare pursuant to 28 U.S.C. §1746, that the following is true and

correct:

    1.     I am the principal of the Law Offices of Wale Mosaku, P.C., attorneys for the

           plaintiff in the above-captioned case.

    2.     I submit this declaration in opposition to the defendants' motion brought

           pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, wherein

           they seek an Order from the Court dismissing all of the plaintiff's federal and

           state law claims with prejudice.

    3.     I am familiar with the facts and circumstances herein, based upon

           communications with the plaintiff; and books and records maintained by my

           office, including but not limited to transcripts of hearings and/or trials

           previously taken of the plaintiff and/or defendant(s) that are pertinent to the

           matter.

4.  A true copy of the Kings County Criminal Court complaint against the plaintiff, with respect to his August 13, 2010 arrest by defendant Caleef McClean[1], is annexed hereto as Exhibit "1".

5.  A true and correct copy of the Notice of Claim that was filed by the plaintiff on October 18, 2010, is annexed hereto as Exhibit "2".

6.  True and correct excerpts from the transcript of the "50-H" hearing of the plaintiff, held on January 31, 2011, are annexed hereto as Exhibit "3".

7.  A true and correct copy of the transcript of the plaintiff's criminal court trial, which was held on November 16, 2011, pertaining to his arrest on August 13, 2010 by defendant McClean, is annexed hereto as Exhibit "4".

Dated:    Brooklyn, New York
        February 23, 2012

/s/

_____

WALE MOSAKU

---

[1] Inadvertently named in this lawsuit as "Caleef McLean".

2

# Exhibit 1

CRIMINAL COURT OF THE CITY OF NEW YORK
PART APAR COUNTY OF KINGS

**2010KN087224**

STATE OF NEW YORK
COUNTY OF KINGS

THE PEOPLE OF THE STATE OF NEW YORK

V

DOUGLAS  ALFORD

LEGAL ASSISTANT ALFRED RIZZO OF THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE SAYS
THAT ON OR ABOUT AUGUST 13,2010 AT APPROXIMATELY 03:05 PM AT THE SOUTH WEST
CORNER OF BROADWAY & MARCUS GARVEY BOULEVARD COUNTY OF KINGS, STATE OF NEW YORK,

THE DEFENDANT COMMITTED THE OFFENSE(S) OF:

PL 275.35            FAILURE TO DISCLOSE THE ORIGIN OF A RECORDING IN
                     THE SECOND DEGREE
AC 20-453            UNLICENSED GENERAL VENDOR

IN THAT THE DEFENDANT DID:

ACT AS A GENERAL VENDOR WITHOUT FIRST HAVING OBTAINED A LICENSE IN ACCORDANCE
WITH THE NEW YORK CITY ADMINISTRATIVE CODE; FOR COMMERCIAL ADVANTAGE OR PRIVATE
FINANCIAL GAIN, KNOWINGLY ADVERTISE OR OFFER FOR SALE, RESALE, OR RENTAL, OR
SELL, RESELL, OR RENT, OR POSSESS FOR SUCH PURPOSES, A RECORDING THE COVER, BOX,
JACKET OR LABEL OF WHICH DID NOT CLEARLY AND CONSPICUOUSLY DISCLOSE THE ACTUAL
NAME AND ADDRESS OF THE MANUFACTURER OR THE NAME OF THE PERFORMER OR PRINCIPAL
ARTIST. THE OMISSION OF THE ACTUAL NAME AND ADDRESS OF THE MANUFACTURER, OR THE
OMISSION OF THE NAME OF THE PERFORMER OR PRINCIPAL ARTIST, OR THE OMISSION OF
BOTH, SHALL CONSTITUTE THE FAILURE TO DISCLOSE THE ORIGIN OF A RECORDING..

THE SOURCE OF DEPONENT'S INFORMATION AND THE GROUNDS FOR DEPONENT'S BELIEF ARE
AS FOLLOWS:

THE DEPONENT IS INFORMED BY THE SUPPORTING DEPOSITION OF POM CALEEF R MCCLEAN
SHIELD NO.10690, OF 079 COMMAND , THAT, AT THE ABOVE TIME AND PLACE, INFORMANT
OBSERVED THE DEFENDANT DISPLAY AND OFFER FOR SALE MULTIPLE CDS ON WHICH THERE
WAS NO CLEAR INDICATION OF THE ORIGIN OF THE RECORDINGS.

SPECIFICALLY, DEPONENT IS INFORMED BY THE ABOVE-MENTIONED SUPPORTING DEPOSITION
THAT INFORMANT OBSERVED DEFENDANT STANDING FOR A PERIOD OF TWO
MINUTES IMMEDIATELY BEHIND A FOLDING TABLE ON WHICH THE ABOVE-DESCRIBED
MERCHANDISE WAS DISPLAYED.

DEPONENT IS FURTHER INFORMED BY THE ABOVE-MENTIONED SUPPORTING DEPOSITION THAT
DEFENDANT WAS UNINTERRUPTEDLY IN IMMEDIATE PROXIMITY TO THE MERCHANDISE,
EXERCISED DOMINION AND CONTROL OVER THE MERCHANDISE, AND DID NOT LEAVE THE
MERCHANDISE UNATTENDED DURING THE ENTIRE PERIOD OF INFORMANT'S OBSERVATION.

DEPONENT IS FURTHER INFORMED BY THE ABOVE-MENTIONED SUPPORTING DEPOSITION THAT
INFORMANT OBSERVED DEFENDANT ARRANGING THE MERCHANDISE ON THE ABOVE-DESCRIBED
DISPLAY AREA SO THAT IT WAS MORE VISIBLE TO PASSERS-BY.

DEPONENT IS FURTHER INFORMED BY THE ABOVE-MENTIONED SUPPORTING DEPOSITION THAT,
AT THE TIME OF INFORMANT'S OBSERVATIONS, DEFENDANT WAS NOT DISPLAYING A LICENSE
ISSUED BY THE DEPARTMENT OF CONSUMER AFFAIRS, AND DID NOT PRODUCE ONE WHEN ASKED
TO DO SO.

DEPONENT IS INFORMED BY THE SUPPORTING DEPOSITION OF RAMON RIVERA, INTERN FOR
THE RECORDING INDUSTRY ASSOCIATION OF AMERICA IN NEW YORK, THAT BASED ON THE
POLICE OFFICER'S DESCRIPTION AND THE INFORMANTS OWN SPECIALIZED TRAINING THAT
THE SEIZED RECORDINGS ARE PIRATICAL AND FAIL TO DISCLOSE THE ACTUAL NAME AND
ADDRESS OF THE MANUFACTURER.

SPECIFICALLY, DEPONENT IS INFORMED BY THE ABOVE-MENTIONED SUPPORTING DEPOSITION
THAT THE CDS' PACKAGING DOES NOT INCLUDE THE TRUE NAME AND ADDRESS OF THE
MANUFACTURER.

FALSE STATEMENTS MADE IN THIS DOCUMENT ARE
PUNISHABLE AS A CLASS A MISDEMEANOR PURSUANT

9/16/2010 11:48:20 AM                K10677623         Arrested: 08/13/2010 15:10

Exhibit 2

## IN THE MATTER OF THE CLAIM OF

## DOUGLAS ALFORD

#### against

THE CITY OF NEW YORK, POLICE OFFICER DANIEL GONG (Shield # 3785)[1], POLICE OFFICER CALEEF MCLEAN (Tax Registration # 942157)[2], and POLICE OFFICERS JOHN DOE 1-8

TO: CORPORATION COUNSEL OF THE CITY OF NEW YORK;
COMPTROLLER OF THE CITY OF NEW YORK.

PLEASE TAKE NOTICE that the undersigned Claimant hereby makes claim and demand against the City of New York, as follows:

1.     The name and post-office address of the claimant and claimant's attorney is:

DOUGLAS ALFORD
1328 Halsey Street, #1L
Brooklyn, New York 11237

Law Offices of Wale Mosaku, P.C.
25 Bond Street, 3rd Floor
Brooklyn, New York 11201

2.     The nature of the claim(s):

Damages for the False Arrest, False Imprisonment, Excessive Force and Violation of the Civil Rights of the claimant.

3.     The time when, the place where and the manner in which the claim(s) arose:

(a)     On or about August 5, 2010, at approximately 5:00 p.m., while the claimant was lawfully in front of the premises described as 210 Joralemon Street, Brooklyn, New York, in the County of Kings, City of New York, the claimant was falsely arrested without probable cause by POLICE OFFICER DANIEL GONG (Shield # 3785) (hereinafter "Gong") and POLICE OFFICERS JOHN DOE 1-4 of, upon information and belief, the 84th Precinct of the Police Department of the City of New York.
At the above-referenced time and place, the plaintiff, who was lawfully engaged in the sale of mixed music Compact Discs (CDs), was approached by

---

[1] Whose Tax Registration # is 938588. And who, upon information and well-founded belief, was assigned to the 84th police precinct at the time of the 08/05/2010 incident.

[2] Who, upon information and well-founded belief, was assigned to the 79th police precinct at the time of the 08/13/2010 incident.

Page 2
Douglas Alford
Notice of Claim(s)

Gong and asked if he had a "license". The claimant handed Gong his driver's license, and guessing that Gong was really inquiring about some sort of vendor's license, also informed Gong that he was not required to have a vendor's license, and as proof, handed Gong a "Decision and Order" dated July 1, 2010, wherein, in a prior action, a New York City Administration Law Judge assigned to the New York City Environmental Control Board, had determined that the claimant, who had been similarly accused of selling CDs without a vendor's license, was not required to have a general vendor's license on the basis that he was a "First Amendment Vendor".

Gong, ignored said "Decision and Order", instructed the claimant not to move, made a few phone calls over a period of 20 minutes, and upon concluding said phone calls, told the claimant to "turn around because you are under arrest". Claimant was then handcuffed and placed in a car that was operated by a female police officer, and transported to the 84th police precinct. The handcuffs were secured too tightly to the plaintiff's wrists, resulting in pain, suffering and numbness. The claimant's complaints about the unnecessarily tightly secured handcuffs were ignored by Gong.

Upon arrival at the 84th precinct the claimant was photographed and fingerprinted. At approximately 12:30 a.m. on August 6, 2010, the claimant was transported to the Brooklyn House of Detention where he was searched. At approximately 11:00 a.m. on August 6, 2010, the claimant was transported to "central booking" located within the NYC Criminal Courthouse building at 120 Schermerhorn Street, Brooklyn, New York 11201.

At approximately 11:30 a.m. on August 6, 2010, the claimant was arraigned before a Judge on charges that he had committed the misdemeanor offense of being an "Unlicensed General Vendor" (A.C. 20-453). The claimant was released on his own recognizance. On October 6, 2010, when the claimant returned to Court in defense of said charges, the matter was adjourned in contemplation of dismissal (ACD), but immediately sealed on the same day. The arrest number was "K10674929-Y". The docket number was "2010KN062529".

(b)     On or about August 13, 2010, at approximately 03:00 p.m., while the claimant was lawfully in front of the premises described as 789 Broadway, Brooklyn, New York, in the County of Kings, City of New York, he was unlawfully arrested without probable cause by POLICE OFFICER CALEEF MCLEAN (Tax Registration # 942157) (hereinafter " McLean") and POLICE OFFICERS JOHN DOE 1-4 of, upon information and belief, the 79th Precinct of the Police Department of the City of New York.

Page 3
Douglas Alford
Notice of Claim

At the above-referenced time and place, the plaintiff, who was lawfully
engaged in the sale of mixed music Compact Discs (CDs), was approached by
Mclean and Police officers John Doe 5-8 and asked for a "license". The
claimant handed Mclean and Police officers John Doe 5-8 his driver's license,
and guessing that Mclean and Police officers John Doe 5-8 were really
inquiring about some sort of vendor's license, also informed Mclean and
Police officers John Doe 5-8 that he was not required to have a vendor's
license, and as proof, handed Mclean and Police officers John Doe 5-8 a
"Decision and Order" dated July 1, 2010, wherein, in a prior action, a New
York City Administration Law Judge assigned to the New York City
Environmental Control Board, had determined that the claimant, who had
been similarly accused of selling CDs without a vendor's license, was not
required to have a general vendor's license on the basis that he was a "First
Amendment Vendor".

Mclean and Police officers John Doe 5-8, ignored said "Decision and Order",
and informed the claimant that the CDs he was selling "looked suspect" and
that he was under arrest. Said officers then told the claimant that they did not
want to take all his merchandise, and that the claimant should give said
merchandise to someone he could trust. The claimant then informed the
officers that he had storage three blocks away from the location of his arrest.
The officers then told the claimant that they would drive him to the storage
facility, and did so. The officers then stood by as the claimant put away his
merchandise. The claimant was told to put his wallet, loose keys and other
personal items in his storage, if he did not want those items confiscated, and
then give the key to his storage to someone he could trust. Claimant complied
with the officers instructions. The officers then walked the claimant to a van
and placed handcuffs on him. The claimant was then driven to the 79th
precinct.

At the 79th precinct, the claimant was photographed and fingerprinted. The
claimant was then given a "desk Appearance Ticket", and instructed to appear
in Court on September 16, 2010. The claimant was released from the precinct
at approximately 05:30 p.m. The claimant forgot to appear at NYC Criminal
Court on 09/16/2010, and fearful that a warrant had been issued for his arrest,
subsequently reported to said court, whereupon he was informed that there
was no record of a warrant. The claimant was instructed by the court
personnel to "forget it" if he did not receive any paperwork from court within
the next three months.

However, when the claimant reported to Criminal Court in defense of the
above-referenced 08/05/2010 arrest charges on October 6, 2010, he requested

Page 4
Douglas Alford
Notice of Claim

> for, and obtained a document from said court, wherein it was stated that the
> Kings County District Attorney had declined to prosecute him, with respect to
> the 08/13/2010 charges. The arrest number was "K10677623".

4.   The items of damage or injury claimed are:

Plaintiff suffered and still suffers Loss of Liberty, confinement, Grievous Mental
Anguish and Emotional Distress, and Psychological Disability and Distress. As a result of
the foregoing, claimant has necessarily been caused out of pocket expenses, including
loss of earnings.

TOTAL AMOUNT CLAIMED: ONE MILLION DOLLARS ($1,000,000.00)

The undersigned claimant therefore presents this claim for adjustment and payment. You
are hereby notified that unless it is adjusted and paid within the time provided by law
from the date of presentation to you, the claimant intends to commence an action on this
claim.

Brooklyn, New York
Dated: October 8, 2010

_____
Douglas Alford

SWORN TO BEFORE ME THIS ____ DAY
OF _____, 2010

_____
NOTARY PUBLIC

ADEWALE A. MOSAKU
Notary Public State of New York
No. 02MO6018153
Qualified in Kings County
Commission Expires January 4, 20__

LAW OFFICES OF WALE MOSAKU, P.C.
ATTORNEYS FOR CLAIMANT
25 BOND STREET, 3RD FLOOR
BROOKLYN, NEW YORK 11201
(718) 243-0994

Exhibit 3

1

2                              DOUGLAS ALFORD

3                              2010PI038758

4                              (015-220)

5      ----------------------------------------X

6      In the Matter of the Claim of:

7      DOUGLAS ALFORD,

8                              Claimant,

9           -against-

10     THE CITY OF NEW YORK, POLICE OFFICER DANIEL

11     GONG, (SHIELD 3785), POLICE OFFICER CALEEF

12     MCLEAN (Tax Registration #942157) and POLICE

13     OFFICERS JOHN DOE 1-8,

14                              Respondent.

15     ----------------------------------------X

16                              189 Montague Street

17                              Brooklyn, New York

18                              January 31, 2011

19                              2:20 P.M.

20

21          50-h HEARING of DOUGLAS ALFORD, the Claimant

22     herein, taken by the Respondent, pursuant to Section

23     50(h) of the General Municipal Law, held at the

24     above-noted time and place before a Notary Public of

25     the State of New York.

2

1

2

3    A P P E A R A N C E S:

4

5

6          WALE MOSAKU, ESQ,
              Attorneys for Claimants
              25 Bond Street
7             Brooklyn, New York 11201

8

9          JANE N. BARRETT & ASSOCIATES, LLP
              Attorneys for Respondents
10            353 Second Street
              Suite 1R
11            Brooklyn, New York 11215

12         BY:  JANE BARRETT, ESQ.
           CLAIM NO.:  2010PI038758

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1

2   D O U G L A S   A L F O R D,

3          The witness herein, having first been duly

4   sworn by June Wagner, a Notary Public in and for the

5   State of New York, was examined and testified as

6   follows:

7   EXAMINATION BY JANE BARRETT, ESQ.:

8          Q     Please state your name for the record.

9          A     Douglas B. Alford.

10         Q     What is your address?

11         A     1328 Halsey Street, apartment 1L,

12   Brooklyn, New York 11237.

13         MS. BARRETT:  Mark these please.

14              (Whereupon, a desk appearance ticket

15         was marked as Respondent's Exhibit A for

16         identification, as of this date.)

17              (Whereupon, a court document was

18         marked as Respondent's Exhibit B for

19         identification, as of this date.)

20              (Whereupon, a court document was

21         marked as Respondent's Exhibit C for

22         identification, as of this date.)

23              (Whereupon, a property invoice was

24         marked as Respondent's Exhibit D for

25         identification, as of this date.)

9

```
 1                        Douglas Alford
 2        Q     I see that this arrest stems from the
 3   sale of the CDs?
 4        A     That's correct.
 5        Q     How long have you been selling CDs?
 6        A     At that particular location?
 7        Q     No, just in general.
 8        A     Two years.
 9        Q     What are the CDs that you sell?
10        A     Music CDs.
11        Q     Is it your music, someone's else's or
12   what?
13        A     We buy the CDs from DJs that produce the
14   CDs.
15        Q     You are acting basically as a retailer,
16   you buy them wholesale and you sell them retail?
17        A     I was actually employed.  I was employed
18   at the time I was arrested.  I was employed by
19   Shaheb Productions.
20        Q     What is Shaheb Productions?
21        A     He was located in Brooklyn, one of the
22   DJs.
23        Q     What is his address?
24        A     308 -- I can't put his street name
25   together.  It's in Williamsburg, Brooklyn.  The name
```

10
1                        Douglas Alford

2    will come to me, I can't get the name right now.

3          Q     Is Shaheb his first name?

4          A     I believe his name is Wally Shaheb.

5          Q     Wally Shaheb?

6          A     Yes.

7          Q     Are these secondhand CDs or are you

8    selling new?

9          A     They are produced by DJs.

10         Q     What are Shaheb Production's role in the

11   production of the CDs?

12         A     He produces his own CDs and he also

13   produces his own music.

14         Q     When you say he produces his own music?

15         A     He is an entertainer.

16         Q     The CDs he is producing are his own

17   music?

18         A     His music among others.

19         Q     What were the terms of your employment

20   with him, did he pay you by the hour, by the CDs or

21   something else?

22         A     He paid by the piecework, by CD.

23         Q     What was the rate of pay?

24         A     $2 per CD.

25         Q     How long had you had that arrangement

1                          Douglas Alford

2    with him?

3         A    Approximately, a year.

4         Q    At the time of this arrangement, were you

5    selling CDs exclusively for him or did you have any

6    other CDs?

7         A    At the time of the arrest, I was selling

8    CDs exclusively with him.

9         Q    That was part of deal with him, you

10   didn't sell for anybody else?

11        A    Correct.

12        Q    How long had you been selling CDs at this

13   particular location?

14        A    Approximately, a year.

15        Q    A year?

16        A    Approximately, yes.

17        Q    On what kind of basis, five days a week,

18   seven days a week?

19        A    Five days.

20             MR. MOSAKU:  What location are we

21        talking?

22             THE WITNESS:  210 Joralemon.

23        Q    That is the municipal building?

24        A    That's correct.

25        Q    What were your usual hours there?

15

1                   Douglas Alford

2        A      That was in Williamsburg, Brooklyn

3   approximately within two blocks of Woodhull

4   Hospital.

5        Q      That was near Shaheb Productions?

6        A      Yes, within the block from Shaheb.

7        Q      On those two arrests did they involve the

8   same officers?

9        A      No, they did not.

10       Q      Different officers?

11       A      Yes.

12       Q      On first arrest in August 5, 2010, that

13   was the one in front of the municipal building?

14       A      That's correct.

15       Q      Your merchandise consisted solely of CDs?

16       A      That's correct.

17       Q      No DVDs, no pictures?

18       A      No DVDs, no pictures.

19       Q      Was your merchandise confiscated at that

20   time?

21       A      Yes.

22       Q      Did you get it all back?

23       A      Yes.

24       Q      Was it in good condition or was it

25   damaged at all?

19

1                    Douglas Alford

2     handcuffed me and put me in the patrol car.

3         Q     Were you subjected to any physical force

4     in the application of the handcuffs?

5         A     The handcuffs, first of all, the

6     handcuffs were put on too tight and I mentioned to

7     Officer Gong, would you lighten the handcuffs, they

8     are kind of tight.  He ignored me.  He just was

9     going about putting my merchandise together.

10        Q     Were you subjected to any of the

11    following forms of physical force, punching,

12    hitting, kicking, slapping?

13        A     No punching, kicking, hitting, slapping.

14        Q     Were you put in the patrol car or van?

15        A     Patrol car.

16        Q     Did you suffer any injury in the process

17    of being put into the patrol car?

18        A     No.

19        Q     Where did they take you?

20        A     They took me to the 84 Precinct in the

21    holding area.

22        Q     Where is that?

23        A     Gold Street, I believe.

24        Q     Is that downtown Brooklyn?

25        A     That's correct.

20

1                         Douglas Alford

2        Q       How long were you there?

3        A       I was there until I would say about

4    midnight.

5        Q       Since about six hours?

6        A       Yes.

7        Q       Were you fingerprinted and photographed?

8        A       Yes, I was.

9        Q       During that time that you were in the 84

10   Precinct on Gold Street, did you request any medical

11   attention?

12       A       I didn't request any medical attention

13   although my left wrist had a red line from the

14   handcuffs.

15       Q       Are you left handed or right handed?

16       A       I am left handed.

17       Q       How long did it take for that to go away?

18       A       At least a week.

19       Q       Did you get any more information or

20   explanation in the time you were at the precinct as

21   to why you had been arrested?

22       A       The only information I got was a friend

23   of mine that said they heard Gong say something

24   similar that he didn't like my attitude.   That's

25   only feedback that I got.

25

1                        Douglas Alford

2        A      Per day working at Joralemon.  It was

3   half of that working at the other location.

4        Q      Did you report any of this on your income

5   tax?

6        A      Yes, I report this as my income, tax

7   income.

8        Q      All of it?

9        A      I report my income.

10        Q      Then there was another arrest just a week

11   later, right?

12        A      Yes.

13        Q      What was the date of that one?

14        A      I believe August 13th, a Friday so

15   August 13th.

16        Q      That was at the Broadway near Flushing

17   location?

18        A      789 Broadway, yes.

19        Q      Were you working for Shaheb or working

20   for yourself?

21        A      I was working for myself.

22        Q      What happened?

23        A      Three officers, I believe it was three

24   officers, walked up to me and asked me for my

25   license.  Once again I told him I am not required to

26

1                      Douglas Alford

2    have a license and I showed them that decision

3    order.  They looked at it and basically said it

4    didn't mean anything to them.

5         Q    Did they say why?

6         A    No particular reason, they just said it

7    didn't -- they didn't understand what it was and it

8    didn't mean anything to them.

9         Q    At this occasion on August 13th, did they

10   say that you couldn't sell the CDs at that

11   particular location or you can't sell them period

12   without a license?

13        A    No.  They said that the particular CDs

14   that I had looked suspect is what they told me.

15        Q    Suspect meaning what, bootleg?

16             MR. MOSAKU:  Did they say anything

17        else other than the word suspect.

18        A    What was the term they used?

19        Q    Copyright?

20        A    No origin, something of origin on the

21   CDs.  I said this CD says Shaheb Productions.  This

22   CD says another thing, so what are you talking

23   about?  He said all of them don't have it, I am

24   going to take these CDs and place you under arrest.

25        Q    Were they indicating to you that they had

38

```
 1                    Douglas Alford
 2            MS. BARRETT:  The record is now
 3        closed.
 4                (Whereupon, the examination of
 5        this witness was concluded at 3:11 P.M.)
 6                *  *  *  *
 7    STATE OF NEW YORK )
 8                     )ss.:
 9    COUNTY OF        )
10                I have read the foregoing record of
11        my testimony taken at the time and place
12        noted in the heading hereof and I do
13        hereby acknowledge it to be a true and
14        correct transcript of same.
15        _____
16                    DOUGLAS ALFORD
17    Subscribed and sworn to before me
18    this _____ day of _____, 2011.
19
20    _____
21                NOTARY PUBLIC
22
23
24
25
```

39

1

2                    CERTIFICATION

3

4       I, June Wagner, a Notary Public of the State of

5    New York, do hereby certify:

6       That the testimony in the within proceeding was

7    held before me at the aforesaid time and place.

8    That said witness was duly sworn before the

9    commencement of the testimony, and that the

10   testimony was taken stenographically by me, then

11   transcribed under my supervision, and that the

12   within transcript is a true record of the testimony

13   of said witness.

14      I further certify that I am not related to any of

15   the parties to this action by blood or marriage,

16   that I am not interested directly or indirectly in

17   the matter in controversy, nor am I in the employ of

18   any of the counsel.

19      IN WITNESS WHEREOF, I have hereunto set my hand

20   this 11th day of February, 2011.

21

22                    June Wagner

23                    JUNE WAGNER

24

25

# Exhibit 4

1

1   CRIMINAL COURT OF THE CITY OF NEW YORK
    COUNTY OF KINGS: PART BTP2
2   ---------------------------------------------x

3   PEOPLE OF THE STATE OF NEW YORK,

                                      DOCKET NO.
4             - against -            2010KN087224

5   DOUGLAS ALFORD,

6                       Defendant.      HEARING

7   ---------------------------------------------x

8                         120 Schermerhorn Street
                          Brooklyn, New York 11201
9
                          November 16, 2011
10

11  B E F O R E:

12            HONORABLE SHAWNDYA L. SIMPSON, JUDGE

13  A P P E A R A N C E S:

14

15       CHARLES J. HYNES, ESQ.
              District Attorney, Kings County
16            BY: SAMUEL DEPAOLA, ESQ.
                  Assistant District Attorney
17

18       JAMES MEADOWS, ESQ.
              Attorney for the Defendant
19            125 Livingston Street
              Brooklyn, New York
20

21

22

23

24                               Alexis Fotiou
                              Official Court Reporter
25

PROCEEDINGS

1        COURT OFFICER:  Calendar No. 6, Douglas Alford.

2        MR. MEADOWS:  On behalf of Mr. Alford, James

3    Meadows, 125 Livingston Street.  Good afternoon, your

4    Honor.

5        MR. DEPAOLA:  Samuel Depaola for the People.

6    Good afternoon, your Honor.

7        MR. MEADOWS:  Your Honor, I like to make an

8    application at this time with Court's permission.  It's

9    been brought to my attention that this is a case regarding

10   my client is being charged with Penal Law Section 275.35,

11   failure to disclose the origin of a recording in the second

12   degree and administrative code 20-453 unlicensed general

13   vendor.  It's been brought to my attention that the

14   counterfeit DVDs -- CDs, excuse me, in this case the

15   evidence was actually destroyed.

16       MR. DEPAOLA:  That is correct, Judge.  It was

17   marked mistakenly by the arresting officer as peddler's

18   property when it should have been marked arrest evidence.

19   People are ready to proceed without the evidence as we do

20   have the officer's independent recollection of the events.

21       THE COURT:  If the whole thing is a origin isn't

22   that an issue that I should decide?

23       MR. DEPAOLA:  Yes, Judge, but we do have the

24   officer's recollection that he will not recall seeing any

25   origin of any manufacturer's name.

3

PROCEEDINGS

1          THE COURT:  Did you take photos?

2          MR. DEPAOLA:  No photographs, Judge.

3          MR. MEADOWS:  Your Honor, the People had a duty

4     if they were to destroy it to take some type of photographs

5     to document this incident.

6          MR. DEPAOLA:  In the People's defense, your

7     Honor, the defendant did bench warrant --

8          THE COURT:  Okay, well listen, that has nothing

9     to do with the fact of the case, that's another issue.  But

10    it's the People's responsibility and unfortunately it's

11    really the police officer's responsibility but the people

12    will have an adverse inference charge or whatever

13    negativity on the fact that that is not available.

14          What is the offer?

15          MR. DEPAOLA:  Violation, time served, Judge.

16          MR. MEADOWS:  Your Honor, just to put on the

17    record at one point the People did decline to prosecute

18    this case.  And it's my understanding when the People found

19    out that my client had a filed a civil case against the

20    City they brought back this case.  They have not offered my

21    understanding as to why this case is still on.

22          It's also my understanding that the People may

23    have spent -- at least the City has spent a tremendous

24    amount of money in resources regarding the civil which is

25    why they didn't dismiss this case in the interest of

4

PROCEEDINGS

1    justice.

2              MR. DEPAOLA:  I have no independent knowledge on

3    that, Judge.

4              THE COURT:  How many witnesses do you have?

5              MR. DEPAOLA:  Two, Judge.

6              THE COURT:  Would you be willing to do a

7    combined?

8              MR. MEADOWS:  Pardon me?

9              THE COURT:  A combined hearing and trial.

10             MR. MEADOWS:  Yes, your Honor, I would.

11             MR. DEPAOLA:  I don't believe there are any

12   hearings.

13             THE COURT:  Okay.  Would he take an ACD?

14             MR. MEADOWS:  No, your Honor.

15             THE COURT:  Not even with immediate sealing?

16             MR. MEADOWS:  No, your Honor.

17             THE COURT:  Second call.  Have a seat.

18                            *    *    *

19             COURT OFFICER:  Recalling No. 6, Douglas Alford.

20             MR. MEADOWS:  Once again for Mr. Alford, James

21   Meadows.

22             MR. DEPAOLA:  Samuel Depaola once again for the

23   People.

24             THE COURT:  What are we doing in this case?

25             MR. DEPAOLA:  We were going to stipulate to the

PROCEEDINGS

1   testimony from the representative of the Recording Industry

2   Association of America.  Counsel and I have looked over the

3   stipulation and we have agreed to its terms.

4                MR. MEADOWS:  That is correct.

5                THE COURT:  All right, are we ready to proceed?

6   What is the offer?

7                MR. DEPAOLA:  A violation and time served.

8                MR. MEADOWS:  Once again that offer is

9   respectfully declined.

10               THE COURT:  Even if it was an ACD it would be

11  declined?

12               MR. MEADOWS:  That is correct, your Honor.

13               THE COURT:  All right, are we ready?

14               MR. MEADOWS:  Yes, your Honor.

15               MR. DEPAOLA:  People are ready.

16               MR. MEADOWS:  Ready.

17               MR. DEPAOLA:  Officer is outside.

18               THE COURT:  Sit down, let's go.  We are

19  combining, correct?

20               MR. MEADOWS:  That is correct.

21               THE COURT:  Let's go.

22               MR. MEADOWS:  Should this matter go past today I

23  will request minutes, my client is indigent.  I was

24  assigned by 18-B.

25               THE COURT:  Not a problem.  Do we have openings?

6

PROCEEDINGS

1       MR. DEPAOLA:   Your Honor, this is a very straight

2   forward case.   You will see that the defendant was required

3   to disclose certain things and that those things were not

4   disclosed when asked of him.

5       In Kings County New York on August 13, 2010 the

6   defendant was observed by the arresting officer an Officer

7   McClean of the NYPD.   He was observed selling various CDs

8   behind a folded table.   You will hear testimony from the

9   officer that he did not remove himself from behind the

10   table other than to rearrange the CDs in order to make them

11   more sellable to the public.

12       You will see that these CDs had inserts in them

13   containing the likeness of various recording artists

14   including Jay Z, Jim Jones and Little Wayne.   Also that the

15   defendant when asked by the officer if he had a general

16   vending license, he did not display one, did not say that

17   he had one and nothing of the like.

18       I believe it is the defendant's defense that he

19   is a first amendment protected vendor.   The people will

20   assert then that he is not and that he was selling

21   parodical CDs and that the CDs are not protected under the

22   first amendment or its auspices.

23       Also, your Honor, you will hear from the

24   stipulated testimony presented that we have clearly

25   delineated what is required of the CDs to be sold to the

PROCEEDINGS

1    public.  And clearly from the arresting officer's testimony

2    you will see that these markings were not present and that

3    the defendant was in fact violating the law in Kings County

4    New York.  Thank you, your Honor.

5            MR. MEADOWS:  May I be heard, your Honor.

6            May it please the Court the people are right that

7    this is a straight forward case.  The first amendment

8    allows people to sell certain merchandise on the street

9    without a vendor's license.  It's my understanding that it

10   includes newspapers, magazines, CDs and DVDs.

11           Now the People are going to allege, your Honor,

12   that CDs and DVDs would be concluded.  However, parody

13   DVDs, CDs wouldn't.  The burden are on the People to prove

14   that my client was selling or attempting to sell or

15   presenting CDs and DVDs on the day of question I believe

16   it's August 13th of 2010 here in Kings County, your Honor.

17           The problem, your Honor, is your Honor heard

18   earlier since this is a bench trial is that the People

19   destroyed their own evidence.

20           We will stipulate that John C. Castillo part of

21   the Recording Industry Association of America is an expert

22   in this field and he's knowledgeable of what is and what is

23   not deemed parodied CDs DVDs.  The last part of the

24   stipulation which obviously will be read into evidence is

25   that that individual does not have any knowledge whatsoever

PROCEEDINGS

1   whether the defendant was selling pirated or unpirated CDs

2   and DVDs.  The burden is on the People to prove that my

3   client was selling DVDs.  The only issue is where those CDs

4   are.  The evidence will show as, your Honor, already knows

5   is that the People destroyed their own evidence.  The

6   People will not be able to establish their case beyond a

7   reasonable doubt and for all those reasons, your Honor, I

8   believe my client should be found not guilty.

9               THE COURT:  Call your first witness.

10              MR. DEPAOLA:  People would now like to call

11  officer Caleef McClean.

12              COURT OFFICER:  Do you swear or affirm the

13  testimony you are about to give here today is the truth?

14              THE WITNESS:  Yes.

15              THE COURT:  State your name, spelling your first

16  and last name, shield, rank and command.

17              THE WITNESS:  First name Caleef, C-a-l-e-e-f,

18  last name M-C-C-L-E-A-N, command 079, ID 10690.

19              COURT OFFICER:  You can have a seat.

20              THE COURT:  Go ahead.

21  DIRECT EXAMINATION

22  BY MR. DEPAOLA:

23      Q.   Good afternoon, Officer McClean, can you please state

24  your name, shield and command for the record.

25      A.   Officer McClean 79 Precinct shield 10690.

P.O. MCCLEAN - DIRECT - PEOPLE

1    Q.    By whom are you employed?

2    A.    NYPD, New York City Police Department.

3    Q.    How long have you been employed by the New York City

4    Police Department?

5    A.    Five years and about three months.

6    Q.    What is your current assignment?

7    A.    My current assignment is called conditions.  I am in

8    the conditions unit.

9    Q.    Was that your assignment at the time of the incident?

10   A.    Yes.

11   Q.    How long have you been assigned to the conditions?

12   A.    About three years.

13   Q.    Directing your attention to 3:05 p.m. on August 13,

14   2010 at the corner of Broadway and Marcus Garvey Boulevard,

15   where were you at that time?

16   A.    I was in a police van, marked police van.  Right in

17   front of 760 Broadway which is right on the corner of Garvey and

18   Broadway.

19   Q.    What county is that in?

20   A.    Kings County.

21   Q.    Did you observe the defendant here today?

22   A.    Yes.

23   Q.    From inside the van?

24   A.    Yes.

25   Q.    Just so we can identify who we are speaking about, do

P.O. MCCLEAN - DIRECT - PEOPLE

1   you see the person you arrested that day inside the courtroom

2   today?

3       A.   Yes.

4               MR. MEADOWS:  Objection, your Honor.

5               MR. DEPAOLA:  Please identify him by a piece of

6       clothing.

7               MR. MEADOWS:  Objection foundation.  I understand

8       it's a bench trial but before he arrested the individual it

9       had to have been some type of story on how he arrested.

10              THE COURT:  I will allow it before you get to

11      that.  Well, before the arrest -- well, just back up.

12      Q.   Back to my previous question, did you observe the

13  defendant from inside the van?

14              THE COURT:  Not defendant.  Did you observe the

15      individual.

16      Q.   The individual, Mr. Douglas Alford?

17      A.   Yes, I was in the police van for about five minutes

18  observing the defendant.

19              THE COURT:  Off the record.

20              (Whereupon, there is a discussion held off the

21      record.)

22              THE COURT:  Back on.

23      Q.   Did you see an individual then selling or appeared to

24  be selling CDs behind a folding table?

25              MR. MEADOWS:  Objection.

P.O. MCCLEAN - DIRECT - PEOPLE

1           THE COURT:  Don't worry about it.

2           Did you see that?

3           THE WITNESS:  Yes, I did.

4      Q.   Is that person here today?

5      A.   Yes.

6      Q.   Can you please identify that individual via an article

7  of clothing please?

8      A.   Wearing I would say a gray suit.

9           THE COURT:  Indicating the defendant for the

10      record, greenish gray suit.

11      Q.   What did you observe the defendant doing at that time?

12      A.   For about five minutes I observed the defendant take

13  out a folding table, place it on a public sidewalk and started

14  taking out music CDs and placing it on top of the table.  I then

15  seen the defendant come around the table, stand behind the table

16  and rearranging the CDs face up to people walking by.

17      Q.   How was he arranging them?

18      A.   He was taking them out of a box with the CD facing up,

19  the cover, basically the cover showing and placing it on top of

20  the table.

21      Q.   How long did you observe the defendant from inside the

22  van?

23      A.   From inside the van approximately five minutes.

24      Q.   Now was anyone else ever behind the folding table or

25  ever touching -- withdrawn.

P.O. MCCLEAN - DIRECT - PEOPLE

1    Q.    Was anyone else ever behind the folding table at this

2    time?

3         A.    No, just the defendant.

4         Q.    Did anyone ever rearrange the disc or touch the discs?

5         A.    No.

6         Q.    Did there come a time when you exited your van?

7         A.    Yes, after observing the defendant for five minutes

8    placing the CDs on the table we did approach him.

9         Q.    Just to backtrack a little bit, did you see passersby

10   while you observed the defendant from inside the van?

11        A.    Yes, people were passing by.

12        Q.    Did you see them glancing at the CDs for sale?

13        A.    I seen them look but nobody stopped right in front the

14   table.  They did look at the CDs while he was arranging them.

15        Q.    Did you see the defendant initiate any passerby as in

16   conversation or anything else?

17        A.    No.

18        Q.    What happened as you approached the defendant after

19   you exited your van?

20        A.    We approached him behind the table.  We asked him does

21   he have a vending license, which he then stated no, he does not.

22   After that I looked at the music CDs and observed the CDs on top

23   of the table and also observed that the CD was clear, CD case

24   with an insert which was photocopied.

25        Q.    I will stop you right there.

P.O. MCCLEAN - DIRECT - PEOPLE

1              So you stated previously that the defendant never

2     produced --

3         A.    No, he did not.

4         Q.    -- a vending license?

5         A.    No, he did not.

6         Q.    What happened after he failed to produce a general

7     vendors license?

8         A.    That's when I proceeded to examine the CDs that were

9     on the table.

10        Q.    Have you received any training regarding parodical CDs

11    and recordings?

12        A.    Yes.

13        Q.    Can you please describe that?

14        A.    It's called peddler training.  We have different

15    labels come to an office to sit down and explain to us what is

16    the proper CD.

17        Q.    Excuse me, by labels do you mean the Recordings

18    Association of America?

19        A.    Yes.

20        Q.    Continue.

21        A.    And they explained to us what is a pirated CD and what

22    is not.

23        Q.    Can you please explain how would you determine a

24    parodical CD from say a CD produced legitimately by a recording

25    label?

P.O. MCCLEAN - DIRECT - PEOPLE

1        A.    Usually a CD that is produced by a recording label has

2    a plastic wrapping around the CD.  It has the artist name on the

3    CD.  Usually it has the company's name, the company's address,

4    on the back of the CD has a bar code, universal price code.

5    When you open the CD the CD itself usually has writing on it.

6    It's not a clear CD, it usually has color on it, either the

7    artist name or like a picture or the insert itself it not a

8    photocopy.  It actually has the picture, it has the logo.  It

9    has the artist name, who produced it, everything is written down

10   on the insert.  Usually it's a thick plastic paper, it's not

11   like a photocopy.

12       Q.    Have you had an opportunity in your public life or

13   civilian life to perhaps look and examine legitimately produced

14   musical CDs?

15       A.    Yes.

16       Q.    Have you made arrests involving parodical CDs prior to

17   this incident?

18       A.    Yes.

19       Q.    About how many?

20       A.    Prior to this incident, about ten.

21       Q.    Now, getting to CDs involved in this incident, can you

22   please describe them?

23       A.    Okay.  The CD was a clear case CD, front was clear,

24   had an insert which was photocopied.

25       Q.    How could you tell it was photocopied?

P.O. MCCLEAN - DIRECT - PEOPLE

1     A.   Because it was faded, the colors was like bleeding

2    into each other.  It was fading.  On top it has the artist face.

3    On the back it was a white clear sheet.  The back of the CD was

4    black, had no bar code.  Also didn't have no writing on the CD.

5    The CD was a clear CD.  There was no writing there.  There was

6    no company name on the CD or the cover, no logos, nothing like

7    that, just the artist faces were on the cover of the insert.

8     Q.   Can you perhaps name any of these artists that you

9    saw?

10     A.   The artist I saw was Jay Z.  They had Little Wayne and

11    they had Jim Jones on it.

12     Q.   Were these all on the same disc?

13     A.   Yes.

14     Q.   Is there anything else you would like to add about the

15    CDs you examined that day?

16     A.   Other than the CD itself was clear.  It was no writing

17    on it, that was about it.

18     Q.   Based on your training and experience both

19    professional and in your civilian life, did you form an opinion

20    as to whether or not the CDs you examined were in fact

21    legitimate?

22     A.   No, they were not legitimate.

23     Q.   Also, just to make the record clear, on any part of

24    the CD or disc did you see the names or addresses of the

25    manufacturers?

P.O. MCCLEAN - DIRECT - PEOPLE

1      A.   No, not at all.

2      Q.   Of the performers?

3      A.   No.

4      Q.   Going back to your unit of command, are unlicensed

5  vendor areas a focus for your unit?

6      A.   Yes, that's one of our many focuses we have.

7      Q.   So it's fair to say that you deal with them on a

8  semi-regular basis?

9      A.   Yes.

10      Q.   Have you undergone any training related to unlicensed

11  vendors?

12      A.   Yes.

13      Q.   Can you please describe that training?

14      A.   Basically it showed us how far apart if they are

15  legitimate vendors with a license from New York, they actually

16  show us the license.  How it looks.  It's actually a tax

17  license.  It's basically saying they are paying taxes for the

18  merchandise and they are selling and they have a right to sell

19  it on the sidewalk.  They can't have it a certain feet from the

20  curb.  It has to be a certain distance from the store and that's

21  about it.

22      Q.   Where was the defendant's table located?

23      A.   The table was right against the curb, on the sidewalk

24  but right up against the curb.  It has to be approximately 12 or

25  15-inches away from the curb.  It was right on it.

1    Q.    Can you state the address for that?

2    A.    It was opposite -- I was at 760 Broadway, so it was

3    opposite 760 Broadway.

4    Q.    What items selling on the street would you need a

5    general vendors license to be selling?

6    A.    Mostly clothes.  You can also sell your own personal

7    music.  You cannot sell music that has a label, basically

8    labeled music.  You can sell your own personal music.

9    Q.    By your own personal music, what do you mean by that?

10   A.    Meaning you are an artist and it's your music that you

11   made.  It's not under no music label.  So you can sell your own

12   personal music, but you cannot sell music that is under a label.

13   You can also sell like umbrellas.  It's a variety of things you

14   can sell on the street.

15   Q.    After you examined the defendant's wares, what

16   conclusions did you come to as to whether he was required to

17   have a general vending license?

18   A.    I looked at the music I noticed that it had different

19   artists on the music by the faces and I noticed that they were

20   pirated by just looking at it.  I can tell it was pirated.

21   Q.    Did the defendant make any statements to you?

22   A.    Not that I recall, no, other than saying he doesn't

23   have a vending license.

24        MR. DEPAOLA:  Can I draw your attention, I would

25   actually like to refresh the witness' recollection with his

1     own supporting deposition, your Honor?

2               MR. MEADOWS:  Your Honor, I will object and say

3          it was asked and answered.  Officer stated he does not

4          recall, he did not give any statement.

5               MR. DEPAOLA:  I believe we are --

6               THE COURT:  Refresh his recollection.

7               MR. DEPAOLA:  Refresh his recollection.

8               THE COURT:  That's fine, just tell us what you

9          are refreshing it with.

10              MR. DEPAOLA:  This is the supporting deposition

11         that the officer filled out, if I may approach.

12              THE COURT:  Show it to defense.

13              MR. MEADOWS:  I have this, yes.

14     Q.   If you can please refer to the statement section.

15     Please inform the court whether that refreshes your

16     recollection.

17     A.   Yes.

18     Q.   Now I want to repeat the question.

19          Do you recall the defendant making any other

20     statements that day to you?

21     A.   Yes.

22     Q.   Can you please tell the court what that was?

23     A.   He stated he brought the CDs from a DJ.

24     Q.   And when did this statement occur?

25     A.   It occurred -- can I check again?

P.O. MCCLEAN - DIRECT - PEOPLE

1      Q.   Please refresh your recollection.

2      A.   At 3:05 p.m.

3      Q.   Was this prior to the arrest of the defendant?

4      A.   Yes.

5      Q.   Did you have your guns drawn as he was making the

6  statement?

7      A.   No.

8            THE COURT:  Did you listen to this music at all?

9            THE WITNESS:  Did I personally, no.

10           THE COURT:  The CDs.

11           THE WITNESS:  No.

12           THE COURT:  You don't know if it was a DJ mix or

13 a song by Little Wayne or Jim Jones?  You don't know if it

14 was individual songs or you don't know if it was a mix

15 tape?

16           THE WITNESS:  By the cover itself it says it was

17 a mix tape, but me listening to it, no I didn't.  But the

18 cover did say it was a mix tape.

19           THE COURT:  The cover said mix tape?

20           THE WITNESS:  Right, mix CD.

21           THE COURT:  You would take that to mean what?

22           THE WITNESS:  That the CD itself has different

23 artists on it.

24           THE COURT:  In what way?

25           THE WITNESS:  Music like songs.

P.O. MCCLEAN - DIRECT - PEOPLE

1              THE COURT:  But when it says different artists,

2       what do you consider a mix tape, like one song, one track

3       is by Jay Z?

4              THE WITNESS:  I take that as each track will be a

5       different artist.

6              THE COURT:  Could it also mean it could be a DJ

7       mix of combined songs, a mix tape?

8              THE WITNESS:  Yes, could also mean that too.

9              MR. DEPAOLA:  Your Honor, if you could please

10      define what you mean by a DJ mix?

11             THE COURT:  He's the one that said it.  I am just

12      asking questions.

13             What do you mean a DJ mix?

14             THE WITNESS:  He stated he brought it from a DJ.

15      What do I know personally?

16             THE COURT:  What do you know is a DJ mix?

17             THE WITNESS:  DJ mix is usually a DJ putting

18      together one or two songs, three songs together into one

19      track.

20             MR. DEPAOLA:  No further questions, your Honor.

21             MR. MEADOWS:  May I proceed?

22             THE COURT:  Go ahead.

23             MR. MEADOWS:  I will be very brief.

24   CROSS-EXAMINATION

25   BY MR. MEADOWS:

P.O. MCCLEAN - CROSS - DEFENSE

1    Q.   You are a police officer.  Good afternoon.

2    A.   How are you doing.

3    Q.   How are you doing.

4         Prior to joining the force, one of the first things

5    was police academy, correct?

6    A.   Yes.

7    Q.   Do you remember them telling you, you have to take

8    meticulous notes?

9    A.   Yes.

10   Q.   Do you know what meticulous notes are?

11   A.   Yes.

12   Q.   What are they?

13   A.   You are taking notes from facts that as you see you

14   write them down.

15   Q.   Besides writing them, were you ever taught to do

16   anything else?

17   A.   Besides writing down the notes?

18   Q.   Writing notes.

19   A.   Memorializing.

20   Q.   Anything in terms of documenting it with photographs?

21   A.   It depends on what it is.

22   Q.   What about maintaining the evidence?

23   A.   Yes, you have to voucher the evidence.

24   Q.   Vouchering evidence.  Fair enough.

25        Do you happen to know how many CDs were there on this

P.O. MCCLEAN - CROSS - DEFENSE

1   case directing your attention to August 13, 2010 as the People

2   stated?

3       A.   I vouchered 33 CDs.

4       Q.   Do you know what happened to the CDs?

5               MR. DEPAOLA:  Objection, your Honor.  People are

6       not presenting any evidence, any physical evidence.

7               THE COURT:  Overruled.

8       Q.   If you know, do you know what happened to those CDs?

9       A.   Yes.

10      Q.   What happened to them?

11      A.   They were destroyed.

12      Q.   Do you know why they were destroyed?

13      A.   Do I know why?

14      Q.   Yes.

15      A.   No, I don't know why.

16      Q.   Did you take any photographs of those CDs in question?

17      A.   No.

18      Q.   Now, you mentioned that my client, Mr. Alford, was too

19  close to the curb for purposes of a vendor, correct?

20      A.   Correct.

21      Q.   Can you repeat, excuse me, where was he in terms of

22  how close was he to the curb?

23      A.   He was right on the curb.

24      Q.   Did you document that anywhere?

25      A.   No because we didn't charge him with that.

P.O. MCCLEAN - CROSS - DEFENSE

1     Q.   How do you remember that?

2     A.   I remember because I remembered.

3     Q.   You have been on the force for five years?

4     A.   Yes.

5     Q.   You made how many arrests?

6     A.   From my career?

7     Q.   In your career?

8     A.   250.

9     Q.   Do you remember each and every arrest?

10    A.   No.

11    Q.   Why is that?

12         MR. DEPAOLA:   Objection, your Honor.

13         THE COURT:   Objection, sustained.  I get it.

14    Q.   You also mentioned that you made ten arrests dealing

15    with vendors?

16    A.   Correct.

17    Q.   Now, in this area are there other vendors that sell

18    goods?

19    A.   Yes.

20    Q.   On that block are there other vendors that sell goods?

21    A.   Yes.

22    Q.   Did you see any other vendors on that day?

23    A.   Yes.

24    Q.   How close were they to my client at the time in

25    question?

P.O. MCCLEAN - CROSS - DEFENSE

1    A.    It was a space between I would say about two or three

2    feet from each other.

3    Q.    Did you go over to the other people on that day?

4    A.    No.

5    Q.    Why is that?

6    A.    Because most of them have a vending license.

7    Q.    Did you ask them to see their vending license?

8    A.    I know them by face.

9    Q.    In the past you have asked at one point?

10   A.    Correct.

11   Q.    That area for them it was legal for them to vend

12   goods, correct?

13   A.    Correct.

14   Q.    And you never took any photographs or -- actually

15   asked and answered.  I am sorry about that.

16         You did state to the court you have no idea what was

17   on those CDs?

18   A.    Correct.

19   Q.    It's your judgment call based on your training that

20   they were, in fact, pirated, correct?

21   A.    Correct.

22   Q.    And it could also be my client's own music, correct?

23   A.    From looking at the cover -- or how would I know it's

24   his music.

25   Q.    How would you not no it's his music?

P.O. MCCLEAN - CROSS - DEFENSE

| | | |
|---|---|---|
| 1 | A. | If it's on the cover, his name was not on the cover. |
| 2 | Q. | But you are not certain what was actually on the CDs? |
| 3 | A. | Correct. |
| 4 | Q. | They could have been blank, correct? |
| 5 | A. | Correct. |
| 6 | Q. | You recall this event, correct? |
| 7 | A. | Yes. |
| 8 | Q. | Why? |
| 9 | A. | I looked over my notes. |
| 10 | Q. | Did you speak with the People, did you speak to the |
| 11 | | assistant district attorney prior to today regarding this case? |
| 12 | A. | Yes. |
| 13 | Q. | How many times have you spoken with the ADA? |
| 14 | A. | Prior to today? |
| 15 | Q. | Yes. |
| 16 | A. | Once. |
| 17 | Q. | How long did you go over prepping this case? |
| 18 | A. | We didn't. |
| 19 | Q. | You did not? |
| 20 | A. | No. |
| 21 | Q. | You have not prepped this case at all? |
| 22 | A. | Today. |
| 23 | Q. | But in the past you have? |
| 24 | A. | No. |
| 25 | Q. | It's your testimony that you never prepared for this |

1    case?

2        A.    I just said today I prepared for it today.

3        Q.    Fair enough.  Did my client give you any other

4    statements?

5        A.    Not that I recall, no.

6        Q.    Do you actually recall my client saying that he

7    brought this from a DJ or you just remember after seeing your

8    note but you are --

9              Do you actually independently recall my client saying

10   he got these CDs from a DJ or do you just remember writing that

11   statement down?

12       A.    I remember if I wrote it down he said it.

13       Q.    But you don't actually recall him saying it, correct?

14       A.    Today, no.

15       Q.    Then?

16       A.    Then if I wrote it down that means he said it to me.

17       Q.    You don't recall my client saying that?

18       A.    Today, no, I don't recall.

19       Q.    Do you recall what my client was wearing on that day?

20       A.    No.

21       Q.    Do you recall the weather conditions?

22       A.    Nice.

23       Q.    How do you recall it was nice?

24       A.    Because that would stand out if it was raining.

25       Q.    You would have written down that it was raining on

1  that day?

2      A.    I wouldn't have written it down, no.

3      Q.    How do you know?

4           MR. DEPAOLA:  Objection as to what he would have

5      written down, your Honor.

6           THE COURT:  It's cross-examination, overruled.

7      Q.    Any reason why you didn't write down my client was in

8  violation being too close to the curb?

9      A.    We didn't charge him with that, there is no reason to.

10     Q.    I understand you always would not write it down if a

11 person was in violation of a law you wouldn't write that down on

12 your notes to refresh at a later time?

13     A.    I remember now as you said it.  I don't have to write

14 it down because I remembered.

15     Q.    Do you recall exactly where this incident occurred?

16     A.    Yes, across the street from 760 Broadway.

17     Q.    Is that in the jurisdiction of your police department?

18     A.    We are New York City Police Department so.

19     Q.    Is that in the jurisdiction?

20     A.    Of my precinct, no.  Across the street from 760

21 Broadway?

22     Q.    Yes.

23     A.    No, it's not in my precinct, but we can cover up to

24 three blocks into another precinct.

25           MR. MEADOWS:  No further questions.

PROCEEDINGS

1           THE COURT:  All right.  I want to keep in mind

2    People we are going right into a trial.  If you want to

3    expand on some things during the direct testimony I am

4    giving you an opportunity to ask any further questions.

5           MR. DEPAOLA:  May I take a short recess?  Two

6    minutes, your Honor.

7           THE COURT:  Okay, five minutes.

8                        *   *   *

9           COURT OFFICER:  Recalling 6, Douglas Alford.

10          THE COURT:  Are we reducing this?

11          MR. MEADOWS:  Yes, your Honor.  It's my

12   understanding I believe the People's understanding that

13   this case had been reduced.

14          THE COURT:  But just in case.

15          MR. MEADOWS:  Yes, just in case.

16          THE COURT:  I believe it was at one point.  Let's

17   just officially I will do it again.  So we are reducing?

18          MR. DEPAOLA:  We are reducing it to the attempted

19   charge for the failure to disclose origins of recording.

20          THE COURT:  People, can I see your complaint?  Do

21   you have an extra copy?

22          So we will reduce.

23          We will proceed.

24          MR. MEADOWS:  Yes, your Honor.  I believe that we

25   need to agree, we just have to read the stipulation into

1       the record.

2              THE COURT: Okay.

3              MR. DEPAOLA: Your Honor, the People would like

4       now to read into the record the stipulation between the

5       people and the defendant. The parties have entered into

6       the following stipulation in connection with the testimony

7       of John C. Cassillo:

8              If John C. Cassillo were called to testify at

9       this trial by the prosecution he would testify as follows:

10      He is the regional director of the Recording Industry

11      Association of America, the RIAA. He represents the RIAA

12      and that the RIAA is the trade group that represents the

13      U.S. music industry. That the RIAA member companies

14      create, manufacturer and distribute 85 percent of all

15      legitimate sound recordings produced and sold in the United

16      States.

17             That he has received training from qualified

18      members of the RIAA staff on matters relating to music

19      piracy, counterfeiting and bootlegging of music. Including

20      but not limited to the identification of unauthorized sound

21      recordings, manufacturing processes and the applicability

22      of relevant state and federal laws. That he is familiar

23      with the operation of illegitimate manufacturing and has

24      specialized knowledge in the field of identification of

25      unauthorized sound recordings.

PROCEEDINGS

1           That this court would have declared John C.

2   Cassillo an expert in the field of legitimate and parodical

3   recordings.  The requirements of the former and the

4   qualities of the latter.

5           He would have testified that based on his

6   training and experience it is his expert opinion that

7   legitimate music produced, manufactured and distributed by

8   member companies including Universal music, Sony, Warner

9   and EMI music do not include compilation cassette disc

10  recordings also known as CDRs containing music from

11  multiple artists and owned by multiple music labels.

12          That the artists known as Jim Jones, Jay Z and

13  Little Wayne have created music owned by member labels and

14  appear on cassette discs, CDs.  Member companies have not

15  compiled CDs or DVDs for manufacturing or distribution on a

16  single disc.

17          Furthermore, that member labels do not

18  manufacturer music on CDRs.  That legitimate music is

19  manufactured on CDs and replicated plans where the sound is

20  pressed or molded into the CD.

21          Illegal music is often created through digitally

22  burning music onto recordable CDRs.  These CDRs are often

23  distributed in thin plastic cases or vinyl CD, add some

24  artwork, input the true name or the address of the

25  manufacturer.

1           Whereas legitimate CDs manufactured by member

2      labels always include artwork, insert and booklet.  And

3      also include the title track on the reverse side of the

4      case and often on the CD itself, along with the true name

5      and address of the manufacturer of the CD.

6           He would also testify that New York State law

7      requires music recording to disclose the name and address

8      of the manufacturer.  He would also have testified further

9      that it is his expert opinion that CDRs are photocopy

10     inserts depicting artists such as Jay Z, Little Wayne and

11     Jim Jones with no listing of the title of the tracks, with

12     no description of manufacturer's name and address would be

13     the result of an illegitimate produced parodical recording.

14          He would also have testified that he has no

15     knowledge of whether the defendant, Douglas Alford, was in

16     actual or constructive possession of any legal or illegal

17     CDs, CDRs or DVDs on or about 3:05 p.m. on August 13, 2010

18     at the southwest corner of Broadway and Marcus Garvey

19     Boulevard in the County of Kings State of New York.

20          THE COURT:  That's it.

21          MR. MEADOWS:  Yes, your Honor.  That's regarding

22     the stipulation.  I don't know if the People are calling

23     witnesses.

24          THE COURT:  Should we call officer McClean back

25     in?

1          MR. DEPAOLA:  One second, Judge.

2          No further questions, Judge.

3          THE COURT:  Okay.

4          MR. DEPAOLA:  People rest their case.

5          MR. MEADOWS:  Application, your Honor.

6          THE COURT:  Yes.

7          MR. MEADOWS:  At this time I would like you to

8     move for trial order dismissal.  Mainly that the People

9     failed to establish -- excuse me, establish prima facie

10    case beyond a reasonable doubt.  Namely, that they failed

11    to reach every element pertaining to failure to disclose

12    the origin of recording in the second degree.

13          As Court knows the evidence was destroyed in this

14    case.  The People don't actually have any proof whatsoever

15    whether these CDs existed, whether these CDs were

16    counterfeit, legitimate, if it was music on them.  If it

17    was blank CDs.  There is no information.  There is no

18    evidence whatsoever except for an officer's testimony

19    stating that he saw jackets and sleeves of DVDs depicting

20    artists but he does not have any other independent

21    recollection or that he has taken any notes, any

22    photographs or for that matter that the People -- excuse

23    me, prior to the destruction of the evidence that there

24    were no photographs made proving that these were pirated

25    CDs.  I believe that element falls on the People and they

1   failed to establish that.

2           And in terms of the unlicensed general vendor

3   under Administrative Code 20.453, the People failed to

4   prove that my client was required to possess a general

5   vendor's license.  The law here in New York City, your

6   Honor, is that in certain areas, if it's a place where

7   other vendors do business.  The officer did state that he

8   did witness other vendors doing business on that day in

9   that corner and they have done.  So he's familiar with the

10  people in that area.  That's a legitimate area where one

11  can be a vendor.

12          The honest is on the People to prove that my

13  client was not compliant with how close he was to the curb.

14  The reason why I bring that up on direct examination was

15  because of the fact that without the People proving that my

16  client did not comply with what other vendors do, my client

17  was there legitimately.  He did not need to possess a

18  vendors license.  He was selling CDs that were protected

19  under the first amendment.

20          And for all those reasons, your Honor, I believe

21  a trial order of dismissal would be the correct thing to do

22  at this time.

23              THE COURT:  People.

24              MR. DEPAOLA:  Your Honor, the People would also

25  like to submit to the court the law under the

PROCEEDINGS

1   administrative code.  Judge, the law in New York requires

2   that each general vendor shall carry his or her license on

3   his or her person and it shall be exhibited upon demand to

4   any police officer.  The vendors license shall contain his

5   own name, his or her license number and a non-removable

6   photograph of the licensed vendor.

7           The defendant produced no such license.  He

8   stated that he had no such license and the mere fact that

9   other vendors were present, means nothing.  He's still

10  required to have a license as the officer noted by the fact

11  that he saw the other vendors who had their license and he

12  knew them by face.

13          THE COURT:  Let me ask you this because you are

14  giving me the 20-453 when the license is required, but

15  under the first amendment, correct, you can sell items

16  without having a license?

17          MR. DEPAOLA:  Those items are limited to books,

18  written materials and paintings and even your own music CDs

19  but music that you purchased from someone else and are then

20  selling, then it would not be.

21          MR. MEADOWS:  Again, the People have not --

22          THE COURT:  You made your argument that's why I

23  am asking him this question.

24          MR. DEPAOLA:  We have the defendant's own

25  statement that he brought them from someone else,

1  therefore, proving prima facie at least that he was not

2  selling his own music.

3  And as for the other charges, failure to disclose

4  the origin of the recording in the second degree, the

5  officer examined the CDs. He has prior training. He saw

6  the photographs and likenesses of prominent artists in the

7  recording industry present on the cover of the CDs. And

8  usually people don't put the faces of other people on their

9  own music.

10  Furthermore, selling other people's music he is

11  required to both list the addresses and names of the

12  performers and the manufacturers of such music, which he

13  failed to do as described by officer McClean. Based on the

14  stipulated to testimony non-parodical music always

15  identifies names of the manufacturers and the performers on

16  the back.

17  THE COURT: But you do agree that the police

18  officer testified that he doesn't know if they were blank

19  CDs. He doesn't know anything that was on the music on the

20  CD. He never listened to it; isn't that correct?

21  MR. DEPAOLA: That is correct, Judge. It is the

22  People's point that based on the defendant's own statement

23  that he brought them from a DJ who ostensibly does not sell

24  blank CDs and someone ostensibly would not sell blank CDs

25  with covers or listing or showing other people's faces on

PROCEEDINGS

1    them in the public.

2              THE COURT:  That's assuming that he listened to

3    the CDs as well.

4              The trial order dismissal is granted.  Case is

5    dismissed.

6              MR. MEADOWS:  Thank you, your Honor.

7                        *    *    *    *    *

8              Certified to be a true and accurate record of the

9    above proceedings.

10   _____

11             Alexis Fotiou
               Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25